IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| CULP, INC., HEALTH | ) | |
| CARE PLAN, and BENEFIT | ) | |
| MANAGEMENT SERVICES, INC., | ) | |
| as fiduciary of the Culp, | ) | |
| Inc. Health Care Plan, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:03cv1015-MHT |
| LAURA H. CAIN, | ) | (WO) |
| | ) | |
| Defendant. | ) | |

OPINION

In this equitable proceeding brought pursuant to the

Employee Retirement Income Security Act of 1974

("ERISA"), § 502(a)(3), as amended, 29 U.S.C.

§ 1132(a)(3), an ERISA plan and its third-party

administrator seek to be reimbursed from settlement

proceeds obtained by a beneficiary in a prior negligence

lawsuit arising out an automobile accident. The

plaintiffs are Culp, Inc. Health Care Plan ("the Plan")

and Benefit Management Services, Inc. ("BMS"); the

defendant is Laura Cain ("Cain"). The court's jurisdiction is proper under 29 U.S.C. § 1132(e)(1).

This matter was heard in a non-jury trial conducted on September 12, 2005. The parties filed supplemental briefs addressing several issues raised by the court during trial. After considering the parties' arguments and the evidence adduced at trial, the court finds in favor of the Plan and BMS, in part, and in favor of Cain, in part.

## I. FACTUAL BACKGROUND

Culp, Inc. ("Culp") sponsored the Plan, a group health plan, and engaged BMS as the Plan's third-party administrator.[1]  At all times relevant here, Cain was an

---

1. The parties stipulated that BMS is a "fiduciary" within the meaning of 29 U.S.C. § 1002(21), which provides that a fiduciary is one who has "any discretionary authority or discretionary responsibility in the administration" of the Plan. Pretrial Order (Doc. No. 71), Stipulations, ¶ 5(a).  BMS made eligibility determinations, so it exercised discretion. Whether BMS was authorized to exercise such discretion, however, is another matter altogether.  See infra Part II.

employee of Culp and a Plan participant within the meaning of ERISA, 29 U.S.C. § 1002(7). The Plan's summary description ("summary description") contains a subrogation provision.[2]

───────────

2. The subrogation provision provides, in relevant part,

> "If the Plan pays [any medical expenses for which a third party is responsible] and if the Covered Person subsequently recovers any amount as damages due to the wrongdoing of another individual or entity, the Plan has the right to immediately recover the amount paid by the Plan on behalf of such Covered Person, unreimbursed by such Covered Person's attorney fees.
>
> "By accepting coverage under the Plan, the Covered Person agrees to reimburse the Plan for the entire amount of payments made by the Plan on behalf of the Covered Person from any monies recovered by the Covered Person for damages caused by the wrongdoing of another individual or entity, unreimbursed by such Covered Person's attorney fees.
>
> "In the event a Covered Person requires [medical care] due to the wrongdoing of another individual or entity, the Covered Person will be asked to sign a
> (continued...)

3

On November 18, 1999, Cain suffered injuries from an automobile accident.  Approximately one month later, BMS, on behalf of the Plan, notified Cain in writing of the Plan's subrogation and reimbursement provisions and asked Cain to sign a Subrogation Reimbursement Agreement to acknowledge these provisions.  The law firm of McPhillips, Shinbaum & Gill, L.L.P. ("McPhillips") was primarily responsible for representing Cain in a state-tort lawsuit she filed against the driver of the other car.  McPhillips wrote to BMS that it would honor any subrogation rights to which BMS and the Plan were entitled under state and federal law.[3]

--------

2.  (...continued)
    Subrogation Agreement, under which the
    Covered Person agrees to reimburse the
    Plan for the entire amount of payments
    made by the Plan on behalf of the
    Covered Person from any monies recovered
    by the Covered Person for damages caused
    by the wrongdoing of another individual
    or entity."

Plaintiff's Ex. 1, Summary description, p. 31.

3.  Pretrial Order (Doc. No. 71), Stipulations,
                                    (continued...)

The Plan subsequently paid at least $ 45,353.51 in medical claims to or on behalf of Cain, of which $ 36,178.70 was related to neck, back, and leg injuries, while the remainder was related to a rotator cuff injury. BMS asked McPhillips to place any funds received as a result of the yet-unsettled tort action into a trust until the Plan's subrogation interests had been severed from Cain's interests.[4]

During her deposition in the state-tort lawsuit, Cain stated that the "majority of the pain [from her back, legs, shoulder, and neck] started after November the 19th, 1999,"[5] the date of the accident.  She also claimed that, because of the accident, the pain in her neck, back, shoulders, and legs was so severe that she could not return to work.  Although Cain indicated that she had

---

3.   (...continued)
¶¶ 5(c), (d), &(e).

4.   Pretrial Order (Doc. No. 71), Stipulations, ¶ (g).

5.   Plaintiffs' Ex. 15, Excerpts from the November 7, 2002, Deposition of Laura H. Cain, p. 43.

neck surgery prior to the accident, she stated in her deposition that post-surgery and pre-accident, "my neck was like normal ... except for a little soreness from the incision."[6] Cain also stated that she used a cane after the accident to assist in walking and needed treatment for depression.[7]

In response to written interrogatories, Cain reiterated that she suffered from back, leg, neck, and shoulder pain, as well as frequent headaches, since the date of the car accident.[8] When asked to give an itemized account of all losses and expenses that she suffered as a result of the accident, Cain's itemized list totaled $ 56,082.41.[9]

Cain settled her tort action for $ 340,000. McPhillips informed the Plan of the settlement and

_____

6.  Id., p. 98.

7.  Id., pp. 112, 115.

8.  Plaintiffs' Trial Exhibit 11, Laura H. Cain's June 18, 2002, Answers to Interrogatories, ¶ 19.

9.  Id., ¶ 24.

6

indicated that the Plan had a subrogation claim only as to $ 8,506.05, minus a pro-rata share of attorneys' fees and litigation expenses. After commencement of the current action and in response to the Plan's filing of a petition for a temporary restraining order, McPhillips transferred the amount of $ 36,178.70[10] from Cain's settlement to the court, pending the resolution of this case.[11]

At a non-jury trial conducted on September 12, 2005, the plaintiffs presented only one witness. Tonya Brignac, a supervisor at BMS, testified that BMS authorized payment of Cain's expenses because of McPhillips's assurance that Cain would comply with the subrogation agreement. She also stated that, although BMS originally believed that Cain's shoulder injury was

_____

10. At trial, Tonya Brignac, a supervisor at BMS, testified that at the time this lawsuit was filed, BMS did not believe that the rotator cuff injury was attributable to the car accident. Thus, those costs were not included in the amount paid into the court.

11. Pretrial Order (Doc. No. 71), Stipulations, ¶¶ 5(i), (j) ,(n), & (o).

7

unrelated to the car accident, her review of Cain's deposition testimony from the state-tort action led her to conclude that all of Cain's injuries were caused by the car accident. Finally, Brignac testified that BMS had consistently interpreted the subrogation agreement to require Plan participants to reimburse the Plan for the full amount of recovery, not an amount reduced by a pro-rata share of attorneys' fees and costs. Cain testified at trial that the attorneys' fees associated with the state-tort action were 40 % of any recovery; she did not discuss the cause of her injuries. Both parties also submitted considerable documentary evidence.

The plaintiffs argued that they should recover $ 45,353.57, plus prejudgment interest, under the Plan's subrogation agreement because the car accident caused all of Cain's injuries. Cain countered that the plaintiffs were entitled to only $ 8,506.05 because some of her injuries were not caused by the accident[12] and that any

_____

12. In support of this contention Cain relied solely
(continued...)

subrogation recovery should be reduced by a pro-rata share of attorneys' fees.

In addition to the arguments presented at trial by the parties, the court raised several issues sua sponte. First, the court asked what standard of review applies to BMS's determination that payments for certain injuries were subject to the subrogation agreement; second, the court noted that the subrogation provision seemed ambiguous as to whether a beneficiary could reduce the subrogation reimbursement by a pro-rata share of the attorneys' fees spent to recover the money. When the plaintiffs stated that BMS had consistently interpreted that provision to mean that subrogation payments are unreduced by attorneys fees, the court asked what standard of review should apply to the Plan administrator's interpretation of the Plan's subrogation provisions.

_____

12. (...continued)
on the deposition testimony of her physician, Dr. Kendrick, taken during the personal injury action.

## II. STANDARD OF REVIEW

This case involves two decisions made by a plan administrator: BMS's determination that all of Cain's injuries were caused by the car accident, and BMS's interpretation of the subrogation provision. The plaintiffs maintain that this court should defer to both determinations.

"Although it is a comprehensive and reticulated statute, ERISA does not set out the appropriate standard of review for actions under [its various remedial provisions]." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 108 (1989) (internal quotations and citation omitted). To fill this gap, the Supreme Court applied a de novo standard of review to actions brought by ERISA plan participants who challenge the denial of benefits under 29 U.S.C. § 1132(a)(1)(B), but explained that an abuse-of-discretion standard of review applies if the plan vests the plan administrator with discretionary

10

authority to make benefit-eligibility determinations or construe the plan's terms.  Id. at 115.

Building on Firestone, the Eleventh Circuit Court of Appeals has developed the following standards of review for ERISA denial-of-benefits cases: (1) de novo, if the plan administrator is not afforded discretion; (2) arbitrary and capricious, if the plan grants the administrator discretion; and (3) heightened arbitrary and capricious, if the administrator has discretion but operates under a conflict of interest.  Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1561 (11th Cir. 1990), cert. denied, 498 U.S. 1040 (1991); see also HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001).

Under Firestone and its progeny, the critical inquiry in determining the appropriate standard of review is whether the administrator making the challenged decision is vested with discretion.  An administrator is vested with discretion only if the plan instrument, in this case

11

the summary description, explicitly grants discretion to the administrator over specific activities.  <u>Firestone</u>, 489 U.S. at 112-13.  Thus, a court may look only to the terms of the plan instrument to determine if the plan administrator is vested with discretion over a certain matter.  <u>Id</u>.

<u>Firestone</u> involved 29 U.S.C. § 1132(a)(1)(B) (authorizing actions by beneficiaries to challenge a denial of plan benefits), while this case involves 29 U.S.C. § 1132(a)(3) (authorizing equitable actions by beneficiaries and plan fiduciaries).  This distinction is significant because the holding in <u>Firestone</u> was limited to actions under § 1132(a)(1)(B): The Court explicitly reserved judgment on the appropriate standards of review for actions under all other remedial provisions of ERISA. <u>Firestone</u>, 489 U.S. at 108.

The Supreme Court has not revisited that question, and the Eleventh Circuit has not applied <u>Firestone</u> outside the denial-of-benefits context.  Accordingly,

what the appropriate standards of review for decisions by plan administrators are in § 1132(a)(3) cases remains an open question in this circuit.  However, nearly every federal court that has addressed that question has concluded that __Firestone__ applies to administrator interpretations of ambiguous plan provisions in actions brought under § 1132(a)(3).  __Sunbeam-Oster Co., Inc. Group Benefits Plan v. Whitehurst__, 102 F.3d 1368, 1373 (5th Cir. 1996); __Cutting v. Jerome Foods, Inc.__, 993 F.2d 1293, 1296 (7th Cir. 1993); __Baxter v. Lynn__, 886 F.2d 182, 187 (8th Cir. 1989); __Germany v. Operating Engineers Trust Fund of Washington, D.C.__, 789 F.Supp. 1165, 1167 (D.D.C. 1992) (Revercomb, J.); __but see Dugan v. Nickla__, 763 F.Supp. 981, 984 n.6 (N.D. Ill. 1991) (Hart, J.).

This court also concludes that the standards of review set forth in __Firestone__ and its Eleventh Circuit progeny apply to other remedial provisions of ERISA, including claims for equitable relief under § 1123(a)(3). This conclusion naturally follows from the Court's

13

observation in <u>Firestone</u> that ERISA abounds with the
language of trust law and that a deferential standard of
review is warranted if the trustee is exercising
discretion granted to it by the trust agreement. 489
U.S. at 110-11. As in the denial-of-benefits setting,
however, discretion must be explicitly vested in a
trustee by the trust instrument itself, which, in the
ERISA context, is the plan's summary description. <u>See
id</u>. at 111-12 (determining whether the plan administrator
had discretion based on the "language of termination pay
plan").

Here, the Plan's summary description explains that
the plan administrator, later identified as Culp, has
"the authority, in its sole discretion, to make any and
all factual determinations, Plan Interpretations,
eligibility and/or other determinations that it deems
necessary."[13] A separate provision states that the plan
administrator "has the sole authority and responsibility

---

13. Summary description, p. 33.

14

to review and make final decisions on all claims to benefits hereunder."[14]    Culp is clearly vested with discretionary authority to make factual determinations and plan interpretations.[15]

The only evidence adduced at trial regarding the subrogation provision came from Brignac, who testified regarding BMS's interpretation of the subrogation provision.   No witness testified as to how Culp interpreted the subrogation provision. Although Culp's lawyer argued that Culp had interpreted the plan to preempt the common fund doctrine, counsel's argument is not evidence.   Thus, the court cannot defer to Culp's interpretation because there is no evidence that Culp ever made one.   Likewise, Brignac's testimony reveals that BMS, not Culp, concluded that all of Cain's injuries were caused by the car accident.   Thus, the court cannot

_____

14. Id.

15. Accordingly, any factual finding or plan interpretation made by Culp would be subject to either the arbitrary-and-capricious or heightened arbitrary-and-capricious standard.   See Williams, 373 F.3d at 1137-38.

15

defer to Culp's factual findings because it never made

any.[16]

_____

16. In a denial-of-benefits case, this problem likely
would not arise because the plan must provide adequate
written notice to the beneficiary of the basis for
denying the benefits. See 29 U.S.C. § 1133. Culp likely
would have written this notice, which probably would have
contained both an interpretation of the subrogation
provision and findings of fact regarding the cause of the
injuries.

ERISA also requires the plan to provide an
administrative review process through which a beneficiary
can challenge the plan's decision to deny benefits. 29
U.S.C. § 1133. Generally, a district court will remand
a case to the administrative body if its decision was
based upon an evidentiary error. Levinson v. Reliance
Std. Life Ins. Co., 245 F.3d 1321, 1330 (11th Cir. 2001).
This is particularly true when the plan administrator has
been granted discretion and the review will be
deferential. Quesinberry v. Life Ins. Co., 987 F.2d
1017, 1025 n.6 (11th Cir. 1993).

Thus, the court would ordinarily remand the case to
the administrative body even if this problem did arise.
However, the court does not have that option here for two
reasons. First, this is not a denial-of-benefits case,
so this case did not come to the court via an
administrative committee. ERISA does not require the
plan to establish a review process when it makes plan
interpretations outside the context of denial-of-benefits
claims -- there is no body to which this case may be
remanded. Second, Culp is the plaintiff here and bears
the burden of proof. It produced no evidence that it
ever interpreted the provision or made a factual
(continued...)

16

Nor does BMS's interpretation warrant any deference. The summary description, which controls whether BMS has discretion, explains that Culp hired BMS as a third-party administrator "to aid in the administration of the Plan's benefit and eligibility provisions."[17]  Although this provision clearly delegates administrative authority over the benefit and eligibility provisions to BMS, it does not delegate to BMS discretionary authority, that is, it does not explicitly grant BMS discretion to interpret plan provisions or make factual determinations while serving as an administrator.[18]

_____

16. (...continued)
determination.  On this point, it failed to carry its burden of proof at trial.

17. Summary description, pp. 40-41.

18. BMS is not implicitly imbued with discretion by the summary description simply because the summary description named it as a third-party administrator.  The Court made clear in <u>Firestone</u> that administrators will not receive the benefit of deferential review unless the plan instrument explicitly grants them discretion. 489 U.S. at 111.

17

To be sure, the summary description memorializes that at least some of Culp's administrative responsibilities are delegated to BMS.  It does not, however, follow that this delegation includes the discretion granted to Culp by the summary description to administer the plan: 29 U.S.C. § 1105(c)(1) provides that the plan instrument "may expressly provide for procedures ... for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities." ERISA allows for the delegation of a fiduciary's discretion to another entity, but only when such delegation is explicitly authorized by the plan instrument.  Because the Plan's summary description does not authorize Culp to delegate its discretion to another entity, Culp could not delegate any of its discretion to BMS.

In short, the summary description does not grant BMS "any discretionary authority or discretionary responsibility in the administration" of the Plan, 29

18

U.S.C. § 1002(21)(A)(iii) (defining "fiduciary" under ERISA).  Indeed, it does not grant BMS any discretion at all.  Because BMS was not granted "any discretion" by the summary description, its decisions do not warrant any deference.  Firestone, 489 U.S. at 113 (emphasis in original).

The court cannot overlook this problem by finding that Culp implicitly delegated its discretion to BMS or somehow adopted BMS's determination.  The purpose of ERISA is to protect contractually defined benefits. Nachman Corp. v. Pension Benefits Guar. Corp., 446 U.S. 359, 374-75 (1980); see generally 29 U.S.C. § 1001 (setting forth congressional findings for passing ERISA). One of the principles underlying ERISA is that the parties to the insurance contract (the employer, the administrator, and the beneficiary) should receive the benefit of the bargain contained in the summary description.  See Brown v. Blue Cross & Blue Shield, Inc., 898 F.2d 1556, 1563 (11th Cir. 1990).

Just as administrators should receive the benefit of their bargain from a plan instrument that grants them discretion to interpret plan provisions, <u>Brown</u>, 898 F.2d at 1563, beneficiaries should be able to obtain the benefit of their bargain and expect fiduciaries to adhere to the plan instrument, <u>see</u> 29 U.S.C. § 1104(a)(1)(D) (stating that a fiduciary must act "in accordance with the documents and instruments governing the plan," as long as those documents do not conflict with provisions of ERISA).

As a beneficiary of the Plan, Cain had a reasonable expectation that Culp would follow the terms of the summary description, which stated that only Culp, and not BMS, would exercise discretion in interpreting the Plan's provisions or making factual determinations. Thus, allowing Culp to "adopt" BMS's interpretation after the fact would be in contravention of the summary description and would undermine the policy goals underlying ERISA.

20

The only entity that appears to have interpreted the subrogation provision or made factual determinations (BMS) was not granted discretionary authority to do so by the summary description. Therefore, BMS's interpretation and factual determinations are subject to de novo review.

### III.  DISCUSSION

The issues presented by this case fall into four general categories: (1) whether this is a valid claim under ERISA, (2) which injuries were caused by the car accident underlying Cain's state-tort lawsuit and are therefore subject to the subrogation agreement, (3) whether any amount of recovery under the subrogation agreement must be reduced by a pro-rata share of attorneys' fees, and (4) whether the plaintiffs are entitled to prejudgment interest on whatever sum is subject to subrogation.

## A. Equitable Claim under ERISA

The court must initially address the threshold question of whether the plaintiffs have stated a claim under ERISA.  Under ERISA, a plan fiduciary may bring a civil action to obtain appropriate equitable relief to enforce the terms of a plan.  29 U.S.C. § 1132(a)(3). "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." Great-West Life & Annuity Ins. Co., Inc. v. Knudson, 534 U.S. 204, 214 (2002).  Whether the plaintiffs' lawsuit, which seeks reimbursement from the proceeds of Cain's settlement, as well as prejudgment interest, costs, and attorneys' fees, constitutes an action at law or in equity is therefore critical to whether this action is proper under ERISA.

In Knudson, the insurer paid over $ 400,000 in medical costs incurred by an insured as a result of a car

**22**

accident.  The insured filed a state-tort action, which settled for $ 650,000, of which over $ 250,000 was placed in a "special needs trust" to cover the insured's medical expenses, $ 13,828.70 was sent to the insurer as reimbursement for medical costs, and the remainder was allocated to attorneys' fees and various costs.  The insurer filed a suit in federal court under 29 U.S.C. § 1132(a)(3) to enforce the plan's reimbursement provision and recover its remaining expenses through restitution. 534 U.S. at 207-08.

After noting that § 1132(a)(3)'s authorization of civil actions seeking "appropriate equitable relief" drew a clear distinction between remedies at law and in equity and permitted only the latter, the Supreme Court held that the restitution was not equitable, and therefore not available under § 1132(a)(3), because the settlement was disbursed either to the special needs trust or to a trust set up by defendant's law firm (which was used to pay creditors) and was not in defendant's actual or

constructive possession.  <u>Id</u>. at 214.  As the dissent noted, "the outcome of this case would be different if Great-West had sued the trustee of the Special Needs Trust, who has 'possession' of the requested funds, instead of the [defendant and her husband], who do not." <u>Id</u>. at 225 (Ginsburg, J., dissenting).

The case at bar differs from <u>Knudson</u> in one crucial respect: whereas the settlement in <u>Knudson</u> was never in the possession of the defendant, the settlement in Cain's case was paid directly to Cain or her lawyers (on her behalf).  Even the $ 36,178.70 currently held by the court can "clearly be traced to particular funds or property in the defendant's possession."  <u>Id</u>. at 214. Because Cain is in actual or constructive possession of the settlement proceeds, this action for restitution lies in equity.  This claim is therefore proper under ERISA, pursuant to 29 U.S.C. § 1132(a)(3).[19]

---

19. This conclusion is consistent with the majority of federal courts that have addressed this question. <u>See</u>, <u>e.g.</u>,  <u>Admin. Comm. of the Wal-Mart Assocs. Health</u>
(continued...)

This conclusion, however, necessarily limits the remedies available to the plaintiffs should they prevail. To the extent the plaintiffs seek to impose personal liability on Cain, the claim would fall outside the reach of ERISA, <u>Knudson</u>, 534 U.S. at 214; accordingly, the plaintiffs can seek only traditional equitable remedies such as a constructive trust. <u>See</u> Restatement of

---

19. (...continued)
<u>& Welfare Plan v. Willard</u>, 393 F.3d 1119, 1121-25 (10th Cir. 2004); <u>Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot and Wansbrough</u>, 354 F.3d 348, 352-58 (5th Cir. 2003); <u>Admin. Comm. of the Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan v. Varco</u>, 338 F.3d 680, 686-88 (7th Cir. 2003); <u>Space Gateway Support v. Prieth</u>, 371 F.Supp.2d 1364, 1368 (M.D. Fla. 2005) (Presnell, J.) (all holding that an ERISA fiduciary's reimbursement action was equitable where the beneficiary had recovered from another entity and constructively possessed as well as legally controlled that recovery in an identifiable fund which belonged in good conscience to the Plan). <u>But see</u> <u>Qualchoice, Inc. v. Rowland</u>, 367 F.3d 638, 650 (6th Cir. 2004) ("[A] plan fiduciary's action to enforce a plan-reimbursement provision is a legal action, regardless of whether the plan participant or beneficiary recovered from another entity and possesses that recovery in an identifiable fund."); <u>Westaff (USA) Inc. v. Arce</u>, 298 F.3d 1164, 1167 (9th Cir. 2002) (holding that an action by an ERISA fiduciary to enforce a plan reimbursement provision was an action at law, even though the plan participant possessed an identifiable fund in an escrow account).

Restitution § 160, p. 640 (explaining that a plaintiff is entitled to the equitable remedy of a constructive trust where a defendant holding title to property has an equitable duty to convey it to the plaintiff on the ground that the defendant would be unjustly enriched by retaining it).

## B. Causation of the Injuries

The court must next determine whether the plaintiffs are entitled to reimbursement under the subrogation agreement.  This inquiry centers on whether the injuries for which the Plan reimbursed or otherwise covered Cain were in fact caused by the car accident.

The plaintiffs maintain that Cain is judicially estopped from arguing that some of her injuries were preexisting because in the state-tort action she testified that all of the injuries arose at the time of the car accident.[20]  The court need not reach this

_____

20. The court has already addressed plaintiffs'
(continued...)

question because a de novo review of the evidence adduced at trial reveals that all of the injuries at issue here were caused by the car accident.

In her deposition during the state-tort action, Cain testified that her neck, back, legs, and shoulder began hurting after the accident.[21]  Although she acknowledged that she had a preexisting neck injury, she stated it was essentially healed at the time of the accident.  She also testified that her depression and inability to work resulted from the accident.  This testimony occurred shortly after the accident and reflects Cain's personal knowledge of how the timing of the injuries corresponded to the accident.

Cain's deposition is the only admissible evidence that the court has before it regarding the cause of

_____

20. (...continued)
contention that the court should defer to BMS's determination that the injuries were caused by the car accident.  See supra Part II.

21. Cain's deposition testimony and answers to interrogatories are admissible as non-hearsay because they are party admissions.  Fed. R. Evid. 801.

Cain's injuries.[22]   Cain did not testify at trial
regarding the cause of her injuries, and she did not call
any witnesses that would call into question her former
testimony.

Therefore, the court finds that the plaintiffs have
proved by a preponderance of the evidence that all of
Cain's injuries at issue here, including the rotator-cuff
shoulder injury, were caused by the car accident.   The
plaintiffs are entitled to be reimbursed for the

---

22. The only evidence Cain offered on this issue was
the deposition of her primary physician, Dr. Kendrick,
from the prior tort proceeding.  Dr. Kendrick stated that
many of the health problems Cain attributed to the
accident were actually preexisting conditions.

The court will not consider Dr. Kendrick's
deposition, however, because it is inadmissible hearsay.
Deposition testimony is excepted from the general rule
prohibiting hearsay only if the deponent is
"unavailable." Fed. R. Evid. 804(b)(1).  The court has
no evidence before it that Dr. Kendrick was "unavailable"
to testify at trial, as that term is defined in Rule
804(a).

Cain's effort to incorporate Dr. Kendrick's
deposition by submitting an affidavit in which he
confirms his prior deposition testimony is unsuccessful
because there is no hearsay exception under the Federal
Rules of Evidence for affidavits.

$ 45,353.51 in medical expenses it paid on behalf of Cain.


### C. Pro-Rata Share of Attorneys' Fees

Although Cain must reimburse the plaintiffs under the subrogation agreement for the costs related to her injuries, the question of whether that amount must be reduced by a pro-rata share of attorneys' fees remains.


### 1.  Alabama's insurance laws

Under Alabama insurance law, an insured may deduct a pro-rata share of the litigation costs and attorneys' fees from the sum that the insurer is entitled to recover under a subrogation agreement. <u>Commercial Union Ins. Co. v. Blue Cross & Blue Shield</u>, 540 So. 2d 1368, 1369 (Ala. 1989).  Under ERISA, however, plans that do not purchase insurance to cover their employees ("self-funded" plans) generally are exempt from state insurance laws and may feature subrogation agreements.  <u>See</u> <u>FMC Corp. v.</u>

29

Holliday, 498 U.S. 52, 58-65 (1990) (holding that ERISA preempts, for self-funded health care plan, state anti-subrogation laws).

In determining whether a plan is self-funded, courts look at whether a plan purchased an insurance policy from an insurance company in order to satisfy its obligations to its participants. FMC Corp., 498 U.S. at 54 ("The Plan is self-funded; it does not purchase an insurance policy from any insurance company in order to satisfy its obligations to it participants.").[23]  The Plan's summary description makes clear that "[n]o benefits are payable by any insurance company" and that Culp "provide[s] all payments for the benefit Plan."[24]  Because the Plan does not purchase third-party insurance to satisfy its

23. Cain's argument that the Plan is not self-funded because employees contribute to the Plan is therefore beside the point. See also Buchman v. Wayne Trace Local Sch. Dist. Bd. of Educ., 763 F.Supp. 1405, 1409-10 (N.D. Ohio 1991) (Walinski, J.) (holding that plan is self-funded because it did not purchase third-party insurance coverage, even if employees contributed to cover their costs).

24. Summary description, Preface.

obligations to its participants, it is self-funded.  <u>Id</u>.

Accordingly, Alabama insurance law, including the right

for an insured to deduct a pro-rata share of the

litigation costs and attorneys' fees from any subrogation

amount, does not apply to the Plan.


    2.  The common-fund doctrine

    Even though Alabama state law does not apply, the

Plan may still be governed by the so-called 'common-fund'

doctrine, in which "a litigant or a lawyer who recovers

a common fund for the benefit of persons other than

himself or his client is entitled to a reasonable

attorney's fee from the fund as a whole."  <u>Boeing Co. v.</u>

<u>Van Gemert</u>, 444 U.S. 472, 478 (1980).  "The doctrine

rests on the perception that persons who obtain the

benefit of a lawsuit without contributing to its cost are

unjustly enriched at the successful litigant's expense,"

<u>id</u>., and is part of the federal common law, <u>United McGill</u>

<u>Corp. v. Stinnett</u>, 154 F.3d 168, 173 (4th Cir. 1998).

### i. Application to ERISA plans

Although the Eleventh Circuit has yet to rule on the applicability of the common-fund doctrine to ERISA plans, every circuit to address the question has upheld an ERISA plan's ability to preclude attorney-fee deductions from any subrogation reimbursements.  See Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274 (1st Cir. 2000); Bollman Hat Co. v. Root, 112 F.3d 113 (3d Cir. 1997); United McGill Corp. v. Stinnett, 154 F.3d 168 (4th Cir. 1998); Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wainsbrough, 354 F.3d 348 (5th Cir. 2003); Health Cost Controls v. Isbell, 139 F.3d 1070 (6th Cir. 1997); Admin. Comm. of the Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Varco, 338 F.3d 680 (7th Cir. 2003).

Based on this overwhelming authority, the court concludes that express language in an ERISA plan can preclude the operation of the common-fund doctrine.

## ii. Terms of the Plan

It is unclear, however, whether the Plan's subrogation provision requires full reimbursement or allows an offset for attorneys' fees. Two sentences in the subrogation provision state that the Plan has a right to be reimbursed from third-party payments "unreimbursed by [the beneficiary's] attorney fees."[25] 'Unreimbursed' is not an actual word in the English language[26] or a term of art within the insurance industry.[27]

In the context of the sentence, it yields two possible (and contradictory) meanings. First, it could be read to mean 'unreduced,' which would require the insured to reimburse the Plan an amount unreduced by attorneys' fees. Under the competing interpretation, the

_____

25. See supra note 2, for the complete subrogation provision, including these two sentences.

26. It appears neither in Black's Law Dictionary nor Webster's Third New International Dictionary.

27. When questioned as to this term's meaning by the court during her trial testimony, BMS supervisor Brignac stated that she knew of no specialized use of the term "unreimbursed" in the industry.

33

term could be read to mean 'not reimbursed,' which would require that the Plan be reimbursed out of monies recovered from a third party but not reimbursed for the cost of attorneys' fees.[28]  A term which lends itself to two possible, and contradictory, meanings is clearly ambiguous.[29]

---

28. The latter interpretation actually seems the more plausible when the meanings of the root and prefix of 'unreimbursed' are examined.  According to <u>Black's Law Dictionary</u>, "reimburse" means "to repay," and  the prefix "un-" means "not," which yields a combined meaning of 'not reimbursed.'  <u>Black's Law Dictionary</u> 1525 (7th ed 1999).

29. The remainder of the subrogation provision does little to clarify the ambiguity.  A third sentence explains that a beneficiary will be asked to sign a subrogation agreement whereby the beneficiary "agrees to reimburse the Plan for the entire amount of payments made by the Plan on behalf of [the beneficiary] from [third-party payments]."  This sentence is virtually identical to the preceding sentence, but lacks the ambiguous phrase containing 'unreimbursed.'

The absence of the ambiguous phrase has two possible explanations.  On one hand, by not qualifying the statement that the reimbursement must be for the entire amount, this sentence could be clarifying the two preceding sentences; on the other hand, the two previous sentences could be read to mean that a reimbursement may be reduced by the amount of attorneys' fees, so repeating
(continued...)

34

### iii. De novo interpretation

BMS's interpretation of this provision is subject to de novo review. <u>See</u> <u>supra</u> Part II. When conducting a de novo review of plan provisions, the court must apply the doctrine of <u>contra</u> <u>proferentem</u>, which requires that ambiguities be construed against the drafter of a document. <u>Lee v. Blue Cross/Blue Shield</u>, 10 F.3d 1547, 1551 (11th Cir. 1994); <u>see</u> <u>also</u> <u>Cagle</u>, 112 F.3d at 1519; <u>HCA Health Servs.</u>, 240 F.3d at 994 (both holding that the doctrine of <u>contra</u> <u>proferentem</u> applies on de novo review but does not apply when the court applies a deferential standard of review).

Because the subrogation provision is ambiguous, the doctrine of <u>contra</u> <u>proferentem</u> requires the court to construe the summary description against Culp, which drafted it. Accordingly, the court concludes that the

---

29. (...continued)
that information here would be redundant. In essence, depending on how one interprets "unreimbursed by attorneys' fees" in the two preceding sentences, the absence of that phrase from this third sentence has two plausible explanations.

subrogation provision allows beneficiaries to deduct a pro-rata share of attorneys' fees from the reimbursement amount.   Here, Cain must reimburse the plaintiffs for $ 45,353.51 in medical expenses.   See supra Part III.B. However, she may reduce her reimbursement to the plaintiffs by the cost of her attorneys' fees from the prior action (40 % of the total recovery) under the common-fund doctrine.   The plaintiffs are therefore entitled to a constructive trust on only $ 27,212.11, which is 60 % of $ 45,353.51.

### D. Prejudgment Interest

The only question remaining is whether to award prejudgment interest to the plaintiffs on the amount of money Cain owes under the subrogation agreement.[30]   Such

---

30. In Flint v. Abb, Inc., 337 F.3d 1326 (11th Cir. 2003), the Eleventh Circuit stated in dicta that a suit by a plan beneficiary against a plan fiduciary for prejudgment interest is an action for legal relief and was therefore inappropriate under § 1132(a)(3).   In light of substantial contrary authority, the validity of this dicta is has been called into question.   In any event,
(continued...)

a remedy is available under 29 U.S.C. § 1132(a)(3) only if it is equitable in nature.  See supra Part III.A.

In equity, if a defendant "has made a profit through the violation of a duty to the plaintiff to whom he is in a fiduciary relation, he can be compelled to surrender the profit to the plaintiff although the profit was not made at the expense of the plaintiff."  Restatement of Restitution § 160(d), p. 646.  The purpose of this equitable remedy is not to compensate the person owed the duty for going without the profits, but to ensure that the fiduciary is not unjustly enriched for its breach.  See Parke v. First Reliance Standard Life Ins. Co., 368 F.3d 999, 1008-09 (8th Cir. 2004).  Thus, a court acting in equity can force a fiduciary who has earned a profit by breaching a duty to disgorge the profits to the party to whom the duty is owed.  Id.

---

30. (...continued)
this case involves a suit by a plan fiduciary against a plan beneficiary, so Flint is inapposite.

Under ERISA, the plan administrator stands in a fiduciary relationship to the beneficiary if the administrator exercises any discretion in performing any of its tasks. Firestone, 489 U.S. at 113. Accordingly, most courts have concluded that an action against a plan fiduciary for prejudgment interest may constitute equitable relief under § 1132(a)(3). See, e.g., Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 209-10 (3d Cir. 2004); Parke v. First Reliance Standard Life Ins. Co., 368 F.3d 999, 1006-07 (8th Cir. 2004); Dunnigan v. Metro. Life Ins. Co., 277 F.3d 223, 229 (2d Cir. 2002); Clair v. Harris Trust & Savings Bank, 190 F.3d 495, 497-98 (7th Cir. 1999). At least one district court in this circuit has reached the same conclusion. Cheal v. Life Ins. Co. of N. Am., 330 F.Supp.2d 1347, 1356 n.11 (N.D. Ga. 2004) (Story, J.).

All of these cases involved a plan beneficiary suing a plan administrator, who exercised discretion over claims decisions, to recover interest on benefits that

38

were improperly withheld or delayed.  <u>See</u> <u>Dunnigan</u>, 277

F.3d at 226 (plan administrator improperly withheld

benefits for over 4 years before reimbursing plaintiff

for health costs); <u>Sketvedt</u>, 372 F.3d at 196-97 (plan

administrator denied benefits for several years but then

extended benefits in light of a judicial decision);

<u>Clair</u>, 190 F.3d at 496 (plan administrator unreasonably

delayed payments of retirement benefits after settling a

lawsuit for improperly denying benefits); <u>Parke</u>, 368 F.3d

at 1003 (plan administrator improperly denied plaintiff

long-term disability benefits for over a year before

voluntarily reinstating benefits).  By improperly denying

benefits, the plan administrator breached a fiduciary

duty to the insured.  It was therefore an appropriate

equitable remedy to require the fiduciary to disgorge the

profit earned on the withheld payments to the beneficiary

to ensure the fiduciary was not unjustly enriched by its

breach.

In this case, however, the plaintiffs, who are the Plan administrators, are suing Cain, who is a Plan beneficiary. Because Cain does not stand in a fiduciary relationship with Culp or BMS, she cannot owe them a fiduciary duty. Although her failure to reimburse the plaintiffs violated her contractual obligations, it was not a breach of a <u>fiduciary</u> duty. Accordingly, forcing Cain to disgorge her profits to the plaintiffs is not a proper equitable remedy. It would instead be a legal remedy that imposes personal liability on Cain.[31]

The plaintiffs, however, will not go entirely without interest on the money to which they were entitled because the beneficiary of a constructive trust is generally entitled to the profits arising from the property while

_____

31. Imagine that the money Cain paid into the court did not earn interest: If the court had entered judgment against Cain for that amount (or more) <u>and</u> required her to pay prejudgment interest, she would have to pay the interest out of her personal assets, which may be money that is not fairly traceable to her settlement proceeds. Because such a remedy would impose personal liability, it is a legal -- not equitable -- remedy. <u>See</u> <u>Knudson</u>, 534 U.S. at 210, 214.

40

in the defendant's possession.   1 Dan B. Dobbs, Law of
Remedies § 4.3(1).   The court has already concluded that
the plaintiffs are entitled to a constructive trust on
$ 27,212.11 of the $ 36,178.70 Cain paid into the court
from the settlement proceeds of the state-tort action.
The $ 36,178.70 has been held in an interest-bearing
account.

Though not technically in Cain's possession after
being paid into the court, the court concludes that the
plaintiffs are entitled to receive the interest earned on
$ 27,212.11 of the $ 36,178.70 paid into the court.
Because $ 27,212.11 is 75 % of $ 36,178.70, not only are
the plaintiffs entitled to $ 27,212.11 of the money paid
into court, but they are also entitled to 75% of the
interest earned on the $ 36,178.70 paid into court.[32]

---

32. The $ 27,212.11 also earned profits during the
time it was in McPhillips's trust account.
Theoretically, the plaintiffs could also be entitled to
enforce a constructive trust on these profits, but only
if they can identify particular funds that are fairly
traceable to the profits on the original constructive
trust of $ 27,212.11 (that is, profits that are a
(continued...)

\* \* \*

An appropriate judgment will be entered consistent with this opinion.

DONE, this the 14th day of February, 2006.

　　　　　　　　　　　　　　 /s/ Myron H. Thompson　　
　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

　　32. (...continued)
definite <u>res</u> and can be tracked back to the original constructive trust) while in McPhillips's possession. The court does not have sufficient evidence to determine if this is possible.